HOAGLAND ET AL., COMMISSIONERS, PLAINTIFFS IN ERROR, v. MARY WURTS, DEFENDANT IN ERROR.

1. The legislative right to order low lands to be drained, at the expense of the owners, rests entirely on ancient custom, and cannot be deduced from the power to legislate, unless, in the particular case, the lands are so situated or conditioned as to make their reclamation a matter of direct public concern.

2. In this state, ancient usage sanctions legislation that provides for the drainage of low lands at the expense of the owners.

3. But such legislation, to be valid, must conform to the usage upon which the right to legislate is founded.

4. A law authorized the cost of a drainage scheme to be estimated, and such estimated expense to be allotted to the land owner in proportion fixed by the mere judgment of the appraisers, in advance of the doing of the work. *Held*—that such a method was a departure from the old usage, and was illegal.

5. The rule of the Agens case does not apply to these meadow cases.

On error to the Supreme Court.   For opinion of Supreme Court, see 10 *Vroom* 433.

The facts appear fully in the opinion of the court.

For the plaintiffs in error, *J. Vanatta.*

For the defendant in error, *J. G. Shipman.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   This litigation has been occasioned by proceedings taken under the act of the legislature entitled "An act to provide for the drainage of lands," approved March 8th, 1871, and its supplement, approved March 19th, 1874.   *Rev., pp.* 662, 665.   The papers in the case show that, by force of these laws, an application was made by the requisite number of the owners of meadows situated on the Pequest river, in Warren and Sussex counties, to the managers of the geological survey, who, having adopted a system of drainage, made a report to the Supreme Court, and thereupon three commissioners were appointed to carry into execution the projected improvement.   By one of the provisions of this original .act, these commissioners were empowered, in order to raise the funds necessary to defray the cost of the enterprise, to issue their official bonds, pledging as a security.the future assessments of the expense that the law authorized them to impose on the land owners.   This step having been taken, and finding it difficult to dispose of such obligations, the supplement above mentioned was passed, the second section of which is as follows, viz. : " That if the said commissioners, after having commenced the drainage of any such tract, and proceeded therewith, shall, before the drainage of the same shall be completed, be compelled to suspend the completion thereof, from any inability at that time to raise the money required therefor, they shall proceed to ascertain the tracts of land benefited, or intended to be benefited, by said drainage, and the relative proportions in which the said

respective tracts have been or will be benefited thereby, and also the expenses already incurred in such drainage, and, as near as may be, the additional expenses required for the completion thereof, which expenses they shall assess on the respective tracts of land in the proportions aforesaid," &c.

It will be observed that, by this clause, the commissioners are authorized to lay prospective assessments for anticipated benefits, and the assessment now brought before the court by this writ of error has been in that fashion. In the Supreme Court it was held that the radical defect of this plan was that, by its operation, the land owner might be made to pay for benefits that might never be realized.

But, on the argument before this court, the broad ground was taken that the whole system for draining lands was illegal and void. The position assumed was that the legislature could not authorize this kind of improvement to be made at the expense, in part, of a land owner who did not agree to the enterprise.

If the law in question were defensible alone on the ground that it is an emanation of the legislative power in its ordinary exercise, I should be constrained to yield my assent to this contention. There is nothing that I know of in the nature of legislation that could stand as a warrant for such an enactment. To make this evident, all we have to do is to realize fully the character of the authority thus assumed. The purpose of the law is to enable one set of land owners to compel another set to co-operate, against their will, to drain that body of meadow land in which they have separate interests. The persons thus coerced manifestly suffer an invasion of their ordinary proprietary rights. Why should they thus be forced either to improve their own land or help to improve the land of others? It cannot reasonably be contended that this burthen must be borne because the improvement is a public one. This was the view of the effect of this act expressed in the case of *Matter of Drainage, &c.*, 6 *Vroom* 497; but as such view was founded on the notion that a legislative requisition that private lands should be drained at the ex-

pense of their owners, was an exercise of power similar in kind to a proceeding to condemn private property for the uses of a public road, I am compelled to think that decision rests upon a basis that is manifestly indefensible. I can see no rational ground for the assumption that the schemes to be executed by this act are, in the main, matters which, in any just sense, can be said to be of public concern. It is true that, under certain conditions, the reclamation of very extensive tracts of land, which are subject to overflows by the tides, or which are otherwise submerged, may assume the importance of a public undertaking. Such was the case presented in the litigation between the *Tide-water Company* and *Coster*, 3 *C. E. Green* 519. Such would be the case if the condition of a tract of land was such as to be detrimental to the public health. But the law is not confined to such cases as these, for its scope embraces every case of a tract of meadows, no matter how small its area, which is distributed among as many as five separate owners. It is extremely plain, therefore, that the legislative purpose embodied in this act cannot be vindicated on the plea that it directly conduces to the general welfare of the community. It does not seem open to question that it is the owners alone who are interested in the compulsory improvement of these lands. True, in such cases, there is a resulting gain to the public, but this is nothing more than the inevitable incident of individual prosperity; the effect of drainage is to cause a more plentiful product than the land would yield in its unreclaimed condition; in this result, the owner is directly interested, the community indirectly only, and it is a perversion of legal terms to call the enterprise, on account of such collateral advantage, a public one. So false is such a contention, that, if yielded to, it would legalize the compulsory establishment of manufactories, or the converting of forests into arable land, or the execution of any private enterprise whatever, as, in all such matters, the state has a remote interest. To call the legislative *fiat* that a half dozen persons shall drain their land at their joint expense and for their private ad-

vantage, an exercise of the taxing power of the state, is, in my judgment, simply a misnomer. Nor is such an exercise of power any more justifiable, if it is to be derived merely from the nature of the legislative authority, than would be an enactment commanding A and, B to farm their several lands at their joint expense ; and yet no one will pretend that this can be done. Under a constitution that guarantees the inviolability of private property, and limits the law-making power to the function of legislation, it appears to me entirely inadmissible to claim that it is a legitimate use of the prerogative to legislate, to enact a law, such as the present one, requiring a few land owners to improve their lands for their own profit, and at their own expense. I regard it as a clear infringement of the constitution, to take, by force of a statute, the money of a person from him, even though such money should, against his will, be used for his private benefit, in the improvement of his land. Such an act has nothing in common, with respect to legal principles, with the condemnation of property for the uses of the community, and to the charging, to a limited extent, of the costs of such improvement upon the land owners specially benefited. I cannot assent to the hypothesis that this law can rest on the state's right to tax, or on its eminent domain.

But, nevertheless, I think this act, with respect to its general scope and operation, is to be vindicated. The right to appoint methods for the draining of meadows has been a branch of legislation that has existed in this state from the earliest times, and has been so frequently exercised and acknowledged, that it has become a part of the local common law. The general act upon this subject, that stands unaltered in the late revision, was enacted at as distant a date as the year 1788, and there is a supplement to it, passed in 1800 ; and from that time to the present, a vast amount of such legislation can be found by turning to the volumes containing our annual statutes. None of such laws have ever been successfully challenged ; but, on the contrary, some of them have been accredited by judicial sanction. In this state of affairs

it seems to me quite too late to revert to first principles in order to overthrow a system of procedure which is possessed of such antiquity, and has to its credit so many recognitions. I therefore am satisfied that this law, with respect to its general form and purpose, is an act of legitimate legislation.

In view of this result, the only question to be decided is, whether the plan adopted for carrying out this purpose is, in all respects, equally legitimate. It was urged as an objection to such plan, that the expenses were authorized to be imposed on the different parcels of land embraced in the area of the project, without limiting the burthen severally imposed by the extent of the benefits severally received, and it was claimed that this was a violation of the rule settled by this court in the Agens case. But I think that rule has no application in this instance. No one can read these various acts relating to the draining of lands and not see at once that they constitute a class standing by itself. Such acts, I have said, relate to private improvements, and the rule referred to applies to public improvements. In the one case there is a public benefit as well as a private benefit proceeding directly from the execution of the project, and therefore the benefits are required to be paid for in part by the particular land owners, and in part by the community. But, in this other case, there is but a private benefit solely, and none of it is therefore chargeable to the public. The consequence is that, in these proceedings to drain meadows, a different rule than that established by the Agens case has been adopted, so that, to require such proceedings to harmonize with the principle of that decision, would be to illegalize the whole series of laws that have been enacted on this subject. That principle is, in my opinion, altogether inapposite in this case.

But while this particular method of distributing the expenses of the enterprise is deemed inappropriate, there are certain other methods that have always prevailed, and which seem to be essential to the system, if its identity is to be preserved. Those methods were to have the land comprehended in the scheme measured and valued, and assessed ratably upon that

basis, or, after the doing of the work, have the expenses apportioned equitably by the judgment of impartial persons. The plan now objected to, and which was pursued in this case, is to allot the respective quotas in advance of the doing of the work, adjusting them by an estimation of anticipated benefits. This is certainly a wide deviation from the practice heretofore pursued. The entire system must rest on the foundation of inveterate usage, and from its nature, therefore, it is not susceptible of essential modifications. The old custom appears to have been to put these schemes for draining lands, for the most part, in the hands of the parties interested; such a power was not likely to be abused, as the check of self-interest would naturally keep it within reasonable bounds; the present act transfers the institution and execution of the undertaking to strangers, who, without risk of loss to themselves, can carry into effect such notions about draining the land of other people as they may chance to entertain, and which notions may be as ruinous, when put in practice, as they were magnificent in design. Such a power is so great, and so liable to perversion, and so utterly subversive of the right of the land owner to manage his own property, that it was not without difficulty that I was led to believe that such an authority could be granted in this state. But there are a number of ancient precedents to this effect, and so I think this law, in its general methods, must be sustained. But when it undertakes, as it does, to substitute, in allotting expenses, a judgment of valuers founded on speculation, in the place of assessment founded on facts, or by a fixed standard, it seems to me that such a procedure is a substantial departure from ancient usage, and on that account cannot be sanctioned. I think the judgment should be affirmed.

In order to avoid misapprehension, it is proper to say that this denial of a right to make an assessment of expenses and benefits in advance of the doing of the work, is based, in the present case, entirely on the fact that such a mode of estimation is inconsistent with that ancient usage that pertains to the draining of meadows. There are authorities that maintain

that such assessments may be made by force of a legislative sanction, in the execution of a public improvement, but that question has not, on this occasion, been considered, and consequently is not now decided.

THE CHANCELLOR. I concur in the views of the Chief Justice, and in the conclusion which he has reached. I do not agree with the court below in the opinion that anticipatory assessments for speculative benefits are unlawful.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, KNAPP, CLEMENT, DODD, GREEN, LILLY, WALES—9.

*For reversal*—None.